ARCATA NATIONAL CORPORATION, a California Corporation, Plaintiff-Appellant,

v.

Robert C. RENGO and William A. Elsasser, Defendants-Appellees.

William A. ELSASSER, Plaintiff-Appellee,

v.

ARCATA COMMUNICATIONS, INC., a California Corporation, Defendant-Appellant.

No. 75–1385.

United States Court of Appeals, Ninth Circuit.

July 2, 1976.

Rehearing Denied Aug. 31, 1976.

---

Cleveland C. Cory (argued), of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for appellant.

George E. Birnie (argued), Portland, Or., for appellees.

OPINION

Before MOORE,* KILKENNY and SNEED, Circuit Judges.

MOORE, Circuit Judge:

The origin of this business transaction which brought the parties into court is to be found in a negotiation in the spring of 1971 which resulted in a written agreement entitled "Plan and Agreement of Reorganization" (the "Plan") whereby William A. Elsasser and Helen B. Elsasser, his wife ("Helen"), and Robert C. Rengo agreed with Arcata National Corporation, a California corporation ("Arcata"), to exchange all the stock of Telequip Corporation, an Oregon corporation (the "Company"), en-

gaged in marketing and installing tele-communications equipment, of which they were the sole stockholders, for 24,000 shares of Arcata to be issued 12,480 shares to Helen and 11,520 shares to Rengo.

The Plan was most comprehensive, consisting of some 23 pages, and specified in paragraph 18 that "[t]his writing and the Exhibits thereto contain the entire agreement of the parties hereto and may not be modified, altered, or changed in any manner whatsoever, except by written agreement signed by the parties hereto."

Under the caption "Certain Leases of Property" the Company represented that it had leased certain of its properties to third parties, and that copies of the leases had been delivered to Arcata. A list of the leases, together with a summary description thereof, was attached as Exhibit D. As part of the Plan were employment agreements containing restrictive covenants between Elsasser and Rengo on the one hand and the Company on the other, forms of which were attached to the Plan.

Paragraph 8 is entitled "Conditions Precedent to Obligations of Arcata" and contains sub-paragraphs (a) through (h). Consistent with paragraph 18, subparagraphs (i), (j) and (k) were added in writing and appear in "ADDENDUM NUMBER ONE" dated as of May 5, 1971. Of these additions only (k) is relevant here, and reads:

"Arcata Leasing Corporation shall have approved the credit of the lessees under the Leases and of the Company's customers identified in Note 5 to the Recent Financials in accordance with its customary standards having in mind the cost of the equipment involved, the length of the lease and such other factors as it is its practice to take into consideration."

The closing was to take place at the office of Arcata's attorneys in San Francisco at 10:00 A.M. on June 2, 1971. On that date, Elsasser flew from Portland to San

* Honorable Leonard P. Moore, United States Circuit Judge for the Second Circuit, sitting by designation.

Francisco to conclude the transaction only to be told by an attorney representing Arcata that Arcata would not complete the stock transfer because it did not wish to assume the leases which it considered poor credit risks. In short, the condition specified in paragraph 8(k) of the Plan had not been met.

In an effort to salvage the transaction, Elsasser telephoned an Arcata official (Thompson) who confirmed Arcata's withdrawal for the reasons stated. However, Elsasser and Thompson continued their telephone conversation and apparently some understanding was arrived at, because Thompson then talked to the attorney who immediately prepared a writing stating Arcata's waiver of the conditions in paragraph 8(k) of the Plan in consideration for Elsasser's undertaking that if Arcata did not approve the credit of the particular leasing customer

> "during the following 60 days THEN the Company itself may lease the system to the customer and may dispose of this lease for immediate cash in any commercially reasonable manner and I will pay to Arcata the excess, if any, of the installed cost of the equipment covered thereby (the cost of the equipment installed and the labor to install it, but not including general and administrative expenses or profit) over the amount realized, PROVIDED, the Company has first offered to sell the lease to me for the installed cost. If the lease has not been disposed of by the Company within 30 days, I agree to purchase it at the installed cost of the equipment."

The steps envisioned were quite clear. Reference is made to customers listed in Note 5. If Arcata Leasing[1] did not approve the credit of any customer so listed during the following 60 days, namely, before August 1, 1971, the Company itself had the option to so lease and thereafter, if it chose, it might dispose of the lease "for immediate cash in any commercially reasonable manner". If Arcata exercised this option the financial consequences of Arcata's

waiver would immediately become apparent and the writing provided that if there were an "excess, if any, of the installed cost of the equipment," "over the amount realized" Elsasser would pay that excess. This was Arcata's consideration for waiving subparagraph 8(k). A further proviso was added for Elsasser's benefit, i. e., that if Arcata chose to sell the lease it must "first [offer] to sell the lease to [him] for the installed cost." If any such lease had not been disposed of within 30 days, Elsasser agreed to purchase it at the installed cost of the equipment. This was the assurance given by Elsasser to induce Arcata to proceed with the terms of the Plan. Arcata apparently never disposed of any of the leases for cash so that Elsasser's obligations in this event never came into being.

The events subsequent to June 2, 1971 clearly show that the parties were proceeding in accordance with the Plan. Arcata acquired the Company stock. Elsasser and Rengo entered into employment contracts with the Company containing restrictive covenants. Subsequently, because of an alleged breach of these covenants, Arcata terminated Elsasser's and Rengo's employment. Litigation resulted, Elsasser and Rengo claiming unlawful termination and Arcata claiming breach of the covenants for which it sought injunctive relief. In the Arcata suit, Elsasser counterclaimed for breach of an alleged oral modification of the Plan wherein he asserted a right to certain leases and the rentals thereunder paid to Arcata.

All controversies which have arisen under the Plan have been settled and are not in issue on this appeal except Elsasser's claim that under an oral agreement with Arcata, he was entitled to the leases and the rental proceeds thereunder at the installed cost of the equipment.

The focal point of this claim centers around the legal effect of the written agreement of May 5, 1971, the written addendum as of May 5, 1971, and the written memorandum of June 2, 1971. In contrast

---

1. An Arcata subsidiary referred to in sub-paragraph 8(k) of the Plan.

to these agreements, Elsasser urges the alleged telephonic agreement with an Arcata officer at the time of the June 2, 1971 writing.

There is no question but that Arcata had the right, under paragraph 8(k) of the Plan, on June 2, 1971 to exercise its right not to proceed. Elsasser, as shown by subsequent events, wished to proceed in accordance with the Plan. The stock was exchanged, the employment contracts were signed and for a time Elsasser and Rengo served and were compensated as employees thereunder. Arcata's only concern was a fear of assuming bad credit risks. If this fear could be eliminated, the transaction could proceed.

Paragraph 18 made clear the necessity for a writing. The writing of June 2, 1971 made equally clear that it was a part of the Plan, witness its first paragraph:

"Reference is made to the Plan and Agreement of Reorganization dated as of May 5, 1971, by and among ARCATA NATIONAL CORPORATION, a California corporation ('Arcata'), ROBERT C. RENGO, WILLIAM A. ELSASSER and HELEN B. ELSASSER, owners of all the issued and outstanding stock of TELE-QUIP CORPORATION, an Oregon corporation (the 'Company'), which Plan and Agreement of Reorganization has been supplemented by an Addendum Number One of the same date, and as so supplemented is hereinafter referred to as the 'Plan'."

Quite apart from the controlling provisions of paragraph 18 there are here presented the strongest reasons for adhering to the parol evidence rule as a matter of law. The only point at issue between Arcata and Elsasser on June 2, 1971 was the credit risk on the leases. The leases were part of the property to be transferred under the Plan. Therefore, to eliminate Arcata's doubts as to their worth, it was wholly logical that it should seek a guarantee to cover any deficiency. This is the only subject of the June 2, 1971 writing, i. e., to protect Arcata from financial loss.

The circumstances surrounding the preparation of the writing are not without significance. Thompson had just reached an understanding with Elsasser, he then conveyed this understanding immediately to Arcata's attorney, who then prepared the writing. Elsasser, with the Thompson conversation just concluded, read the writing. It permits no other legal construction than that it set forth certain Arcata options (it "may lease" and "may dispose") and an obligation of Elsasser to pay certain sums *if* the options were exercised. Elsasser's only commitment to purchase was *if*, in the event Arcata decided to sell the lease, the lease had not been disposed of within 30 days of that decision. Had the writing of June 2, 1971 been intended, as Elsasser now argues, to give him an absolute right to purchase the leases for installed cost, he would have been the first to comment on the absence of any such provision.

However, the question before us is not whether an oral agreement for the sale of the leases by Arcata to Elsasser was made on June 2, 1971, or whether the writing accurately expresses or integrates any such agreement. The writing on its face does not purport to do other than to deal with a particular condition of the original Plan.

Significant also is a letter from Elsasser's attorney, not written until over a year after the August 1, 1971 so-called deadline, namely, dated August 7, 1972[2] wherein he assumes that unless the four leases described in the Plan were accepted by Arcata within the time limit, they remained the property of Elsasser and Rengo. No such agreement is to be found either in the Plan or even in the alleged oral agreement. If there had been, it seems highly unlikely that Elsasser or his attorney would not have sought their return if they were no longer assets sold pursuant to the Plan.

The parties have adhered to their agreement pursuant to the Plan. This is not only evidenced by the stock transfer but by the litigation over the employment contracts

---

**2.** The trial court's opinion indicates that this letter was written on August 7 after the August 1, 1971 deadline. Although the year is omitted from the opinion, it is "1972" over a year later.

and restrictive covenants provided for in the Plan. To rewrite the Plan, as in effect decreed by the decision below, would amount to a judicial rewriting of an already executed agreement. This the law does not permit.

Judgment reversed. Complaint dismissed.